UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

BRANDY BAIN JENNINGS,

      Petitioner,

v.                             Case No.:  2:13-cv-751-FtM-38MRM

SECRETARY, DEPARTMENT
OF CORRECTIONS and
ATTORNEY GENERAL, STATE
OF FLORIDA,

      Respondents.

_____/

### OPINION AND ORDER[1]

Before the Court is Petitioner Brandy Bain Jennings' Amended Petition

for Writ of Habeas Corpus Under 28 U.S.C. § 2254.  (Doc. 61).  Jennings,

through counsel, challenges his 1996 convictions for three counts of murder

and one count of robbery, for which he was sentenced to death by the Twentieth

Judicial Circuit Court, in and for Collier County, sitting in Pinellas County,

Florida.[2]  He raises the following grounds for relief:  (1) Jennings was denied

effective assistance of counsel at the penalty phase in violation of the Sixth,

---

[1] Disclaimer: Documents hyperlinked to CM/ECF are subject to PACER fees.  By
using hyperlinks, the Court does not endorse, recommend, approve, or guarantee
any third parties or the services or products they provide, nor does it have any
agreements with them.   The Court is also not responsible for a hyperlink's
availability and functionality, and a failed hyperlink does not affect this Order.

[2] Jennings' trial was conducted in Pinellas County pursuant to an order granting a
change of venue.

Eighth, and Fourteenth Amendments; (2) Jennings' convictions and sentences are materially unreliable because trial counsel was ineffective for failing to adequately impeach the prejudicial testimony of Angela Cheney; (3) the postconviction court erred in summarily denying several claims in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments; (4) the trial court should have suppressed Jennings' statements to law enforcement authorities and all evidence derived from it, as the statements were obtained in violation of his right to counsel; and (5) Jennings' death sentence violates the Sixth and Eighth Amendments and due process because a jury did not make the findings of fact necessary to render him eligible for a death sentence.  (*Id*.).

Respondents filed an amended response (Doc. 66), and Jennings filed a reply (Doc. 67).

## I. Timeliness and Evidentiary Hearing

Respondent concedes the Petition is timely filed.  (Doc. 66 at 39-40).  The Court agrees.

Jennings asks for an evidentiary hearing on each of his claims.  (Doc. 61 at 27).  In support, he claims, "The state court evidentiary development was limited in fundamental ways and inadequate."  (*Id*. at 38).  Respondent argues Jennings does not carry his burden of establishing his entitlement to an evidentiary hearing.  (Doc. 66 at 46-47).

A federal court "must limit its review under § 2254(d) to the state court's record." *Brannon v. Sec'y, Fla. Dep't of Corr.*, No. 19-13757, 2020 WL 2188675, at *5 (11th Cir. May 6, 2020) (finding district court erred in granting evidentiary hearing and considering evidence not before the state court). "An evidentiary hearing is unnecessary unless it would "enable [a postconviction petitioner] to prove the petition's factual allegations, which, if true, would entitle [him] to federal habeas relief." *Samuels v. Sec'y, Dep't of Corr.*, No. 19-13445, 2020 WL 2097260, at *1 (11th Cir. May 1, 2020) (quoting *Crowe v. Hall*, 490 F.3d 840, 847 (11th Cir. 2007)). "[T]he burden is on the petitioner to establish the need for an evidentiary hearing." *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1318 (11th Cir. 2016) (citations omitted), cert. denied, __ U.S. __, 137 S. Ct. 2245 (2017). Conclusory allegations will not suffice. Instead, a petitioner must proffer specific facts and evidence, which, if true, would prove an entitlement to relief. *Id.* at 1319.

Jennings has set forth no specific facts or evidence which warrant an evidentiary hearing. As discussed *infra*, Jennings does not establish that the state court erred in summarily denying certain claims. The Court finds an evidentiary hearing is not warranted because the material facts are developed in the record. *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (if the record refutes the factual allegations in the petition or otherwise precludes habeas relief, a district court need not hold an evidentiary hearing); *see also Jones*, 834

F.3d at 1318-19. Jennings has not demonstrated he is entitled to an evidentiary hearing, 28 U.S.C. § 2254(e)(2), and therefore his request for an evidentiary hearing is denied.

## II. Factual and Procedural Background

### A.  Trial and Sentence

On December 20, 1995, a grand jury returned indictments charging Jennings and Charles Jason Graves with three counts of premeditated murder and one count of robbery.  (Direct Appeal Record (DA) at 20-21).  Tom Osteen and Adam Sapenoff from the Office of the Public Defender represented Jennings.  Graves was represented by private counsel.  Jennings filed a pretrial motion to suppress statements made to law enforcement (DA at 152) and motion for change of venue (DA at 108).   The circuit court denied the motion to suppress (DA at 170) but granted a change of venue (DA at 140).

Jennings' trial started on October 28, 1996 in Pinellas County, Florida. On October 31, 1996, the jury found Jennings guilty of murdering Dorothy Siddle, Vicki Smith, and Jason Wiggins during the robbery of a Cracker Barrel restaurant in Naples, Florida.   (Trial Transcript (TT) at 835).  The penalty phase proceeding was held the next day.   The jury, by a vote of 10-2, recommended the death penalty for each murder count.  (Penalty Phase Transcript at 163).  The trial court, following the jury's recommendation, sentenced Jennings to death (DA at 790).   The Florida Supreme Court

accurately summarized the underlying facts presented at trial in Jennings'

direct appeal:

> Dorothy Siddle, Vicki Smith, and Jason Wiggins, all of whom worked at the Cracker Barrel Restaurant in Naples, were killed during an early morning robbery of the restaurant on November 15, 1995. Upon arriving on the scene, police found the bodies of all three victims lying in pools of blood on the freezer floor with their throats slashed. Victim Siddle's hands were bound behind her back with electrical tape; Smith and Wiggins both had electrical tape around their respective left wrists, but the tape appeared to have come loose from their right wrists.
>
> Police also found bloody shoe prints leading from the freezer, through the kitchen, and into the office, blood spots in and around the kitchen sink, and an opened office safe surrounded by plastic containers and cash. Outside, leading away from the back of the restaurant, police found scattered bills and coins, shoe tracks, a Buck knife, a Buck knife case, a pair of blood-stained gloves, and a Daisy air pistol.
>
> Jennings (age twenty-six) and Jason Graves (age eighteen), both of whom had previously worked at the Cracker Barrel and knew the victims, were apprehended and jailed approximately three weeks later in Las Vegas, Nevada, where Jennings ultimately made lengthy statements to Florida law enforcement personnel. In a taped interview, Jennings blamed the murders on Graves, but admitted his (Jennings') involvement in planning and, after several aborted attempts, actually perpetrating the robbery with Graves. Jennings acknowledged wearing gloves during the robbery and using his Buck knife in taping the victims' hands, but claimed that, after doing so, he must have set the Buck knife down somewhere and did not remember seeing it again. Jennings further stated that he saw the dead bodies in the freezer and that his foot slipped in some blood, but that he did not remember falling, getting blood on his clothes or hands, or washing his hands in the kitchen sink. Jennings also stated that the Daisy air pistol belonged to Graves, and directed police to a canal where he and Graves had thrown other evidence of the crime.

In an untaped interview the next day, during which he was confronted with inconsistencies in his story and the evidence against him, Jennings stated, "I think I could have been the killer. In my mind I think I could have killed them, but in my heart I don't think I could have."

At trial, the taped interview was played for the jury, and one of the officers testified regarding Jennings' untaped statements made the next day. The items ultimately recovered from the canal were also entered into evidence.

The medical examiner, who performed autopsies on the victims, testified that they died from "sharp force injuries" to the neck caused by "a sharp-bladed instrument with a very strong blade," like the Buck knife found at the crime scene. A forensic serologist testified that traces of blood were found on the Buck knife, the Buck knife case, the area around the sink, and one of the gloves recovered from the crime scene, but in an amount insufficient for further analysis. An impressions expert testified that Jennings' tennis shoes recovered from the canal matched the bloody shoe prints inside the restaurant as well as some of the shoe prints from the outside tracks leading away from the restaurant.

The State also presented testimony concerning previous statements made by Jennings regarding robbery and witness elimination in general. Specifically, Angela [Cheney], who had been a friend of Jennings', testified that about two years before the crimes Jennings said that if he ever needed any money he could always rob someplace or somebody. [Cheney] further testified that when she responded, "That's stupid. You could get caught," Jennings replied, while making a motion across his throat, "Not if you don't leave any witnesses." On cross-examination, [Cheney] further testified that Jennings had "made statements similar to that several times."

The State also presented testimony concerning previous statements made by Jennings regarding his dislike of victim Siddle. Specifically, Bob Evans, one of the managers at Cracker Barrel, testified that Jennings perceived Siddle to be holding him back at work and that, just after Jennings quit, he said about Siddle, "I hate her. I even hate the sound of her voice." Donna

Howell, who also worked at Cracker Barrel, similarly testified that she was aware of Jennings' animosity and dislike of Siddle, and that Jennings had once said about Siddle, "I can't stand the bitch. I can't stand the sound of her voice."

The jury found Jennings guilty as charged. In the penalty phase, the defense presented mitigation evidence, including general character testimony from witness Mary Hamler, who testified on direct examination that she had lived with Jennings for two and one-half years. She also testified that Jennings had gotten along well with her children during that time, and that he cried when they (Jennings and Hamler) broke up.

On cross-examination, the State elicited testimony from Hamler that there was another side to Jennings' character and that Jennings once said that if he ever committed a robbery, he would not be stupid enough to stick around, but would go north. Hamler further testified on cross-examination that Jennings was angry at Cracker Barrel in general, and Siddle in particular, for "jerking him around" and holding him back at work, and that in this regard Jennings once said of Siddle that "one day she would get hers."

The defense presented further character evidence from several of Jennings' friends that he was good with children, got along with everybody, and was basically a nonviolent, big-brother type who was happy-go-lucky, fun-loving, playful, laid back, and likeable. Jennings' mother testified that her son never met his father and that she raised Jennings herself. She claimed that Jennings had been a straight-A student, but quit school to take care of her when she became sick.

The jury recommended death by a vote of ten to two as to each of the murders. In its sentencing order, the trial court found three aggravators: (1) that the murders were committed during a robbery; (2) that they were committed to avoid arrest; and (3) that they were cold, calculated, and premeditated (CCP).

The trial court found only one statutory mitigator: that Jennings had no significant history of prior criminal activity (some weight). The trial court explicitly found that two urged statutory mitigators did *not* exist: that Jennings was an accomplice in a capital felony

committed by another and that his participation was relatively minor; and that Jennings acted under extreme duress or under the substantial domination of another person. The trial court also found eight nonstatutory mitigators: (1) that Jennings had a deprived childhood (some weight); (2) that accomplice Graves was not sentenced to death (some weight); (3) that Jennings cooperated with police (substantial weight); (4) that he had a good employment history (little weight); (5) that he had a loving relationship with his mother (little weight); (6) that he had positive personality traits enabling the formation of strong, caring relationships (some weight); (7) that he had the capacity to care for and be mutually loved by children (some weight); and (8) that he exhibited exemplary courtroom behavior (little weight).

After evaluating the aggravators and mitigators, the trial court sentenced Jennings to death for each murder. The trial court also sentenced Jennings to fifteen years' imprisonment for the robbery.

*Jennings v. State*, 718 So.2d 144, 145-47 (Fla. 1998) (footnotes omitted). The Florida Supreme Court affirmed the conviction and sentence on direct appeal. *Jennings v. State*, 718 So. 2d 144 (Fla. 1998). Jennings unsuccessfully petitioned the United States Supreme Court for a writ of certiorari. *Jennings v. Florida*, 527 U.S. 1042 (1999).

### B.   State Post-Conviction Proceedings

Jennings raised twenty-five postconviction claims in state court. (Post-Conviction Appeal Record (PCA) at 2289-2400). The postconviction court granted an evidentiary hearing on five ineffective-assistance claims and summarily dismissed the rest. (PCA 2549-2570). Over several days, the postconviction court heard testimony from eleven witnesses: trial attorney Thomas Osteen, mental health experts Dr. Thomas Hyde, Dr. Hyman

Eisenstein, and Dr. Faye Sultan, and friends and family members, including Angela Cheney, Patricia Scubbard, Lloyd Scubbard, Heather Johnson, Kevin McBride, Bruce Martin, and co-defendant Graves.  (PCA at 2645-3154).

Osteen, who had represented about 30 capital defendants at the time of Jennings' trial, was assisted by co-counsel Sapenoff and investigator Ed Neary. At the postconviction hearing, Osteen testified mainly about his investigative and strategic decisions.   When Osteen began representing Jennings, he enlisted the help of two mental health experts:  psychiatrist Robert Wald and psychologist Russell Masterson.  Osteen asked Dr. Wald to evaluate Jennings' competency and delve into his personality and background for anything that could be a mitigating factor during sentencing.  Dr. Masterson supplemented Dr. Wald's work with psychological testing.   Osteen chose Drs. Wald and Masterson because he had a good relationship with them, and they understood the type of evaluation he wanted.  It was Osteen's practice to speak with the doctors after receiving their reports to get more detail.  Osteen ultimately determined that Jennings did not have a strong mental-health defense and chose not to present testimony from Dr. Wald or Dr. Masterson because it would open the door to harmful evidence mentioned in their report, like Jennings' criminal history.

Osteen said he probably did not consult the ABA guidelines when representing Jennings, and he did not hire a mitigation specialist.  He instead

relied on Neary to investigate Jennings' background. Osteen did not know if Neary traveled outside Florida for this case. Osteen himself talked to Jennings, his mother, and several of his friends. Osteen recalled that Jennings came from a lower socioeconomic background, but that he had a close, loving relationship with his mother, Tawny Jennings. At the penalty phase of the trial, Osteen had Jennings' mother and friends testify about his positive character traits and hopefully elicit sympathy from the jury.

All three post-conviction medical experts testified about Jennings' history of head injuries, febrile seizures, and drug and alcohol abuse. The results of behavioral neurologist Thomas Hyde's examination of Jennings were mostly normal. But because of some subtle neurological findings and Jennings' history, Hyde recommended neuropsychological testing. Jennings' counsel thus hired neuropsychologist Hyman Eisenstein, who tested Jennings first in 2000 and again in 2010. In 2000, Dr. Eisenstein found that Jennings had above-average intelligence, but discrepancies between certain scores, like Jennings' verbal IQ and performance IQ, suggested brain dysregulation. Dr. Eisenstein described the results as "sort of a red flag saying there is something going on here that is not typical." (PCA at 2999). But he reached no clinical diagnosis in 2000.

The results of Dr. Eisenstein's 2010 testing fit with the 2000 results, but this time he diagnosed Jennings with a reading disorder and intermittent

explosive disorder.  Dr. Eisenstein testified that Dr. Masterson's conclusions were consistent with his, but he criticized the sufficiency of Dr. Masterson's testing and reporting.  Applying his findings to the facts of this case, Dr. Eisenstein opined that Jennings' untreated reading disorder "led to tremendous amounts of aggression and hostility disproportionate to any precipitating event or factor." (PCA at 2718).  He then concluded that the murders were not premeditated because some unknown provocation during the robbery triggered Jennings' intermittent explosive disorder, creating in Jennings an irresistible impulse to kill the victims.

Psychologist Ellen Sultan investigated Jennings' background and testified about factors that could have been considered mitigating.  Dr. Sultan found that sexual abuse was pervasive in Jennings' extended family.  She described Tawny Jennings as mentally ill and inadequate as a parent.  Tawny introduced Jennings to marijuana, fed him beer as a baby, and told him about her history of sexual abuse at an inappropriate age.  Dr. Sultan, like Dr. Eisenstein, diagnosed Jennings with intermittent explosive disorder, but she did not tie the murder to the diagnosis.  While she found none of Florida's statutory mitigators applicable, Dr. Sultan considered Jennings a "quite damaged person" who operates "in the world in a highly dysfunctional way." (PCA at 3096).  And she opined that Jennings' background—particularly the excessive and prolonged substance abuse beginning in pre-adolescence and a

sexually exploitative, neglectful, and impoverished childhood environment—are predictive of impulse control, attention, and concentration problems, occupational and social difficulties, propensity towards criminal behavior, and the inability to regulate emotions.

Jennings' cousin, Patricia Scudder, and her husband, Lloyd Scudder, testified about Jennings' life before he moved to Florida. Patricia described Jennings' childhood homes as very messy, with dirty dishes, papers, and dog feces everywhere. Tawny's bed was so covered in clothes she slept in a hide-a-bed with Jennings. Patricia described Tawny's relationship with Jennings as close and loving, but also overprotective and sometimes inappropriate. For example, Tawny breastfed Jennings until he was four or five years old. Lloyd Scudder described Tawny as a bad mother. He understood her only sources of income to be welfare and "hooking."

Tawny had a series of boyfriends, including Frank, who seemed jealous of Jennings and tried to push him away from his mother. Once, Patricia walked into the apartment and saw Tawny in bed with a man—both naked—with Jennings lying on the floor watching television. Both Scudders identified child molesters in Jennings' extended family, but neither claimed that Jennings himself was abused.

Angela Cheney appeared and mostly answered questions about her trial testimony—that Jennings said he could get away with robbery by leaving no

witnesses, while gesturing across his throat.  Cheney's testimony was largely unchallenged at trial, but at the hearing she revealed details Osteen could have used to attack her credibility.  Cheney became friends with Jason Graves in high school, and she met Jennings through Graves.  Cheney dated Jennings for about a month and did not maintain a friendship with him after they broke up.  She later married Graves' brother, Robert Cheney.  Robert was present when Cheney first met with police to give her statement, but they were divorced or separated during Jennings' trial.  Cheney acknowledged being partly motivated by concern for Graves' well-being.  But she also reaffirmed the truthfulness of her trial testimony.

Jason Graves testified at the postconviction hearing, but he said nothing notable, and neither party relied on his testimony in their briefs to this Court. Three of Jennings' friends from his teenage years—Heather Johnson, Kevin McBride, and Bruce Martin—testified that he was not an aggressive person but could get angry when provoked.  They also described Jennings' heavy drinking and regular drug use.

After hearing and considering this testimony, the postconviction court denied Jennings' motion for postconviction relief.   (PCA at 3247-3260). Jennings appealed to the Florida Supreme Court and simultaneously petitioned for a writ of habeas corpus.  Denying both, the Florida Supreme Court held:  (1) Jennings' "trial counsel was not ineffective for failing to obtain

or present childhood and background mitigation" because Osteen's mitigation strategy could be considered sound; (2) trial counsel was deficient in the cross-examination of Angela Cheney, but the failure did not undermine the court's confidence in the outcome because other compelling evidence supported it; (3) the postconviction court did not err by summarily dismissing three of Jennings' claims because each was procedurally barred, refuted by the record, or both; and (4) Jennings' appellate counsel was not deficient for failing to raise certain issues on appeal because none of those issues had merit. *Jennings v. State,* 123 So. 3d 1101 (Fla. 2013).

Jennings now petitions this Court for a writ of habeas corpus.

### III.  Applicable Habeas Law

### A. AEDPA

The Antiterrorism Effective Death Penalty Act (AEDPA) governs a state prisoner's petition for habeas corpus relief. 28 U.S.C. § 2254. Relief may only be granted on a claim adjudicated on the merits in state court if the adjudication:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This standard is both mandatory and difficult to meet. *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014). A state court's violation of state law is not enough to show that a petitioner is in custody in violation of the "Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Wilson v. Corcoran*, 562 U.S. 1, 16 (2010).

"Clearly established federal law" consists of the governing legal principles set forth in the decisions of the United States Supreme Court when the state court issued its decision. *White*, 134 S. Ct. at 1702; *Casey v. Musladin*, 549 U.S. 70, 74 (2006) (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). Habeas relief is appropriate only if the state court decision was "contrary to, or an unreasonable application of," that federal law. 28 U.S.C. § 2254(d)(1). A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of Supreme Court precedent it the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005); *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000), or "if the state court either

unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Bottoson,* 234 F.3d at 531 (quoting *Williams,* 529 U.S. at 406). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter,* 562 U.S. 86, 101 (2011). "[T]his standard is difficult to meet because it was meant to be." *Sexton v. Beaudreaux,* 138 S. Ct. 2555, 2558 (2018).

Finally, when reviewing a claim under 28 U.S.C. § 2254(d), a federal court must remember that any "determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt v. Titlow,* 134 S. Ct. 10, 15 (2013) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.").

### B. Retroactivity

Federal courts generally "cannot disturb a state conviction based on a constitutional rule announced after a conviction became final." *Knight v. Fla. Dep't of Corr.,* 936 F.3d 1322, 1331 (11th Cir. 2019), *cert. denied* --- U.S. --- (2020) (citing *Teague v. Lane,* 489 U.S. 288 (1989)). "Only two narrow

exceptions pierce this general principle of nonretroactivity:  new rules that are 'substantive rather than procedural,' and 'watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding.'"  *Id.* (quoting *Schriro v. Summerlin,* 542 U.S. 348, 352-53 (2004)). When a question of retroactivity arises, a federal court must conduct a threshold *Teague* analysis.  *Id.* (citing *Horn v. Banks (Banks I),* 536 U.S. 266 (2002)).

### C. Exhaustion and Procedural Default

AEDPA precludes federal courts, absent exceptional circumstances, from granting habeas relief unless a petitioner has exhausted all means of relief available under state law.  Failure to exhaust occurs "when a petitioner has not fairly presented every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review."  *Pope v. Sec'y for Dep't. of Corr.,* 680 F.3d 1271, 1284 (11th Cir. 2012) (cleaned up).  The petitioner must apprise the state court of the federal constitutional issue, not just the underlying facts of the claim or a similar state law claim.  *Snowden v. Singletary,* 135 F.3d 732, 735 (11th Cir. 1998).  Respondents concede that Jennings exhausted all grounds but one, which the Court will address below.

### D. Ineffective Assistance of Counsel

In *Strickland v. Washington*, the Supreme Court established a two-part test for determining whether a convicted person may have relief for ineffective

assistance of counsel. 466 U.S. 668, 687-88 (1984). A petitioner must establish: (1) counsel's performance was deficient and fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced the defense. *Id.* This is a "doubly deferential" standard of review that gives both the state court and the petitioner's attorney the benefit of the doubt. *Burt,* 134 S. Ct. at 13 (citing *Cullen v. Pinholster,* 131 S. Ct. 1388, 1403 (2011)).

When considering the first prong, "courts must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Sealey v. Warden,* 954 F.3d 1338, 1354 (11th Cir. 2020) (quoting *Strickland,* 466 U.S. at 689). When considering counsel's duty to investigate, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690-91. The Eleventh Circuit has held that while counsel in a capital case must conduct an adequate background investigation, it need not be exhaustive. *Sealey,* 954 F.3d at 1355.

The second prong requires the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland,* 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "An ineffective-assistance claim can be decided on either the deficiency or prejudice prong." *Id.* And "[w]hile the *Strickland*

standard is itself hard to meet, 'establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)).

**Analysis**

## A. Ground One: Jennings was denied effective assistance of counsel at the penalty phase in violation of the Sixth, Eighth, and Fourteenth Amendments

Jennings argues that lead trial counsel Thomas Osteen failed to adequately investigate Jennings' past for mitigating evidence, and as a result, Osteen did not provide his mental health experts—Dr. Wald and Dr. Masterson—with necessary documents (like school and medical records). That failing, coupled with incomplete testing and reporting by Wald and Masterson, led to inaccurate and inadequate evaluations and reports. (Doc. 61 at 45-84). Respondent concedes this claim is exhausted for habeas purposes. (Doc. 66 at 47).

The Florida Supreme Court evaluated Jennings' argument in two components: failure to present mental health mitigation and failure to conduct an adequate background investigation. As to the mental-health component, the court found that Osteen made a reasonable strategic decision not to present mental mitigation testimony because he believed (1) this was not a strong mental-health case and (2) it could have opened the door to other damaging evidence, like Jennings' drug use and criminal history. The Florida Supreme

Court was unmoved by Jennings' attacks on the work of Dr. Wald and Dr. Masterson, which was mostly fueled by the testimony of Dr. Eisenstein. It agreed with the lower court's characterization of Dr. Eisenstein's criticism as "mere semantics." *Jennings*, 123 So. 3d at 1115.

The state court also found, despite Jennings' contentions, that Dr. Wald and Dr. Masterson "were aware of and considered [Jennings's] history of head injuries, drug and alcohol use, and childhood psychiatric treatment for anger issues." *Id.* And the court held that Osteen could not have been deficient for relying on qualified experts, even if Jennings presented more favorable expert opinions post-conviction. Finally, the court found that even if Osteen and his experts should have sought more information, Jennings did not show prejudice because he identified no particular information that would have made a difference.

As to the insufficient-investigation component of this claim, the Florida Supreme Court found no deficiency in trial counsel's performance. The court noted that Dr. Masterson's findings were similar to Dr. Sultan's, despite Dr. Sultan's more thorough background investigation. It found that "this is not a case where trial counsel failed to investigate, obtain, or provide any background information to the experts and therefore could not have made a reasoned strategic decision about its presentation." *Id.* The court excused Osteen's failure to discover the history of sexual abuse in Jennings' family

because his practice was to inquire into sexual abuse and it never came up as an issue.  In fact, Jennings denied any history of sexual abuse.  Even if Osteen should have discovered the abuse in Jennings' family, the state court found no prejudice:

> While information concerning the sexual abuse of his family members might have been mitigating in establishing Jennings' troubled childhood and emotional development, the trial court found as nonstatutory mitigation that Jennings had a deprived childhood, and the presentation of this testimony might have run contrary to counsel's strategic decision of finding friends who could speak positively about Jennings.

*Id.* at 1118.

Jennings objects to several aspects of the state court's analysis.  First, he bristles at the characterization of Dr. Eisenstein's criticism of Dr. Masterson's report as "mere semantics."  But arguing about what is and is not "mere semantics" is simply more semantics.  What matters is whether Osteen was constitutionally deficient for relying on Dr. Masterson's report.  Dr. Eisenstein found Dr. Masterson's report "grossly insufficient" from a "neuropsychiatric aspect" and more of a "neuropsychological screener" than a full examination report.  (PCA at 2751).  But he also called the report "a good starter" for someone "trying to figure out if there is significant mitigation or not."  (PCA at 2753-54).  And despite the differences in their testing and reporting practices, Dr. Eisenstein testified that Dr. Masterson's conclusions were consistent with his.  (PCA at 2698).   After carefully reviewing Dr.

Masterson's report, given Dr. Eisenstein's criticisms, the Court finds Osteen's reliance on the report to be within an objective standard of reasonableness.

Dr. Eisenstein did reach several diagnoses that Dr. Masterson did not—most notably intermittent explosive disorder (IED). The IED diagnosis did not stem from neuropsychological testing. Rather, in accordance with the DSM-IV, Dr. Eisenstein based it on discrete episodes of aggressive impulses grossly out of proportion to any precipitating psychosocial stressors, as reported by Jennings and his mother. Dr. Masterson did not fail to uncover Jennings' history of violent incidents—he mentions several in his report—and he reported a clinical indication of "difficulty with impulse control." (PCA at 3767). So, although Osteen did not have formal diagnosis of IED, he did have the information he needed to make an aggressive-impulse argument at sentencing. But that might have done more harm than good by opening the door to Jennings' prior violent acts. It certainly would have conflicted with Osteen's strategy of emphasizing Jennings' positive character traits.

Next, Jennings argues that Osteen failed to obtain enough school and medical records, which would have shown a history of febrile seizures and repeated head injuries. Osteen knew of Jennings' history of head injuries because Dr. Masterson mentioned it in his report. Osteen apparently did not know of the febrile seizures, but Jennings fails to show how that knowledge might have impacted the trial. According to Dr. Hyde, the importance of the

febrile seizures and repeated head injuries was that they showed a need for neuropsychological testing. But since Osteen had Jennings tested, knowledge of the seizures would not have led to the discovery of any additional mitigating information.

Jennings' argument that Osteen failed to adequately investigate his life before moving to Florida is likewise unavailing. He points to new details presented at the postconviction hearing of his squalid childhood living conditions and his troubled relationship with his mother. But Osteen had ample information on Jennings' early life from Jennings' extensive self-reporting, and he used that information successfully at sentencing—the trial court considered Jennings' deprived childhood a mitigating factor. Osteen's strategy of focusing on the positive aspects of Jennings' relationship with his mother also bore fruit, as the trial court considered it another mitigating factor.

Osteen did not learn of the sexual abuse pervasive in Jennings' family and Jennings' exposure to known child molesters. Although Jennings himself was not a victim of those men, Dr. Sultan explained how learning about sexual violence at a young age could have been mitigating:

> Q     You mentioned that [Tawny Jennings] was a victim of sexual abuse. To your knowledge, was Mr. Jennings aware that his mother had been sexually abused?
>
> A.     Yes. It was one of the first things he told me about actually.

Q.    Can you briefly explain what kind of impact that might have on an individual, the knowledge that his mother had been sexually abused by family members?

A.    There is a body of literature that has to do with witnessing sexual violence and being told about sexual violence at an inappropriate age.  I don't know what an appropriate age would be—adulthood would be an appropriate age, but he was a pre-adolescent when he knew about this.  What we know is that even the telling of such stories produce significant emotional distress in children because they're simply not prepared—in a brain development sense, not prepared for the kind of information.  So I don't know how to separate out the contribution of that damage to Mr. Jennings' state, but I know that it certainly contributed.

(PCA at 3099).

That Osteen's investigation did not uncover this information does not necessarily show he was ineffective.  "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."  *Strickland*, 466 U.S. at 691.  "An attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him.  *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999).   Osteen did not learn of the sexual abuse in Jennings' family because neither Jennings nor his mother told him about it.  He interviewed both in preparation for sentencing, and it was his practice to investigate past sexual abuse.  Osteen was not deficient for relying on Jennings to self-report this type of potentially mitigating information.

Osteen's investigation of Jennings' background might not have been exhaustive, but it was reasonable and adequate.  Osteen's investigation decisions were guided largely by the information he received from Jennings. As the Supreme Court explained, "Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by defendant.  In particular, what investigation decisions are reasonable depends critically on such information." *Strickland*, 466 U.S. at 691.  Every mental health expert consulted in this case—before and after trial—agreed that Jennings has an above-average intelligence, and none found any mental health issues that would make him an unreliable historian.  Osteen properly relied on Jennings to self-report his history.

Based upon a thorough review of the record, the Court finds the state court's denial of relief on this ground was not contrary to or an unreasonable application of *Strickland*.

**B. Ground Two:   Jennings' convictions and sentences are materially unreliable because trial counsel was ineffective for failing to adequately impeach the prejudicial testimony of Angela Cheney**

Jennings claims Osteen was constitutionally ineffective for failing to adequately cross-examine Angela Cheney.  (Doc. 61 at 84-93).  The state concedes this ground is exhausted for habeas purposes.  (Doc. 66 at 66).

During the guilt phase of Jennings' trial, Angela Cheney gave the following testimony:

> Q.   Now, let me direct your attention back before the November 15th, 1995 Cracker Barrel murders and robbery.  Do you recall having a discussion with the Defendant, Brandy Jennings, about a robbery?
> A.   Yes, sir.
> Q.   It where did this discussion occur?
> A.   At his apartment.
> Q.   All right.  And would you tell the jury about this discussion. What did he say and what did you say?
> A.   There was a couple people around and we were just talking about money and stuff like that and he said if he ever needed any money, he could always rob someplace or somebody. And we were talking and I said, "Well that's stupid.  You can get caught."   And he said, "Not if you don't leave any witnesses."

(TT at 699-700).  Cheney also testified that Jennings gestured across his throat as he spoke.  Osteen's cross-examination was minimal.  He asked when the conversation occurred—November 1993—and who else was there—Chris Graves and someone named Bruce.  The sentencing court cited Cheney's testimony to support the avoiding arrest and cold, calculated, and premeditated (CCP) aggravating factors.  Jennings faults Osteen for not attacking Cheney's credibility with (1) her relationships with Jennings and Graves, (2) her communications with Graves after his arrest, and (3) her history of drug use.[3]

---

[3] Jennings also argues that Osteen should have impeached Cheney's testimony with evidence that Jennings lived at North Gate Club apartments with Bruce

Upon review, the Florida Supreme Court found that Osteen "was deficient with respect to his preparation for and cross-examination of Cheney" because "by failing to question Cheney about her potential motivations and biases in this case, regardless of whether any such biases influenced her testimony, counsel deprived the jury of the ability to make a fully informed decision about Cheney's credibility." *Jennings,* 123 So. 3d at 1119. Despite the state's use of Cheney's evidence to support a guilty verdict and two aggravating factors, the Florida Supreme Court determined that Jennings failed to prove prejudice. The court reasoned Osteen's deficiency did not undermine the state court's confidence in the guilty verdict because "the State presented considerable other evidence of Jennings' guilt… Specifically, Jennings made inculpatory statements to law enforcement, owned the murder weapon, and left bloody shoe prints leading away from the murder scene." *Id.* at 1120.

The court likewise found no prejudice in the sentencing phase because the aggravators were supported by other evidence. For the CCP aggravator, that evidence included "Jennings' established dislike for one of the victims, the speed with which the robbery and murders were accomplished, and Jennings'

---

Martin in November 1993. This evidence contradicts Cheney's testimony at the 2010 postconviction hearing, when she recalled the conversation occurring at an apartment they shared—perhaps in a complex called Waverly. But the evidence would not have impeached her trial testimony, so it is not relevant here.

ownership of the murder weapon[,]" as well as the "execution-style nature of the killings." *Id.* And for the avoid arrest aggravator, the court noted that Jennings wore gloves but no mask, even though the witnesses knew and could identify him, and that the victims were restrained in the freezer, so Jennings could have eliminated any immediate threat by securing the freezer door. Finally, the court found that an adequate cross-examination would not have entirely destroyed Cheney's credibility. *Id.* at 1121.

Jennings argues the state court unreasonably applied *Strickland* by (1) glossing over the significance of Cheney's testimony and (2) applying the wrong standard—that an adequate cross-examination must have entirely destroyed Cheney's credibility. Both of Jennings' arguments mischaracterize the state court's reasoning. It did not downplay the significance of Cheney's testimony or apply an overly rigorous standard. Rather, the court considered the other evidence to determine the likelihood of a different outcome had Cheney not testified at all.

The *Strickland* Court explained the legal standard courts should use when assessing prejudice from counsel's errors:

> When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence…, the question is whether there is a reasonable probability that, absent the errors, the sentencer…would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

*Strickland*, 466 U.S. at 696. The state court's application of *Strickland* was proper. In fact, by evaluating the evidence as if Cheney had not testified, it applied a standard more favorable to Jennings than required, because adequate cross-examination would have impeached—not excluded—Cheney's testimony. Jennings has no right to relief on this ground.

### C. Ground Three: The state court erred in summarily denying three meritorious claims in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments

This ground has multiple parts. First, Jennings argues the state court erred by denying an evidentiary hearing on three postconviction claims: (1) the prosecutor made improper statements and arguments at trial, (2) Osteen was ineffective for failing to challenge forensic evidence, and (3) Osteen was ineffective for failing to challenge the admissibility and reliability of Jennings' statements to the police. Because the postconviction court denied two of these claims before the postconviction evidentiary hearing, Jennings complains it violated Florida Rule of Criminal Procedure 3.851. (Doc. 61 at 94-99). The state concedes this ground is substantially exhausted. (Doc. 66 at 75).

No habeas relief lies for the post-conviction court's refusal to grant an evidentiary hearing on three of the claims. It is "beyond debate" that Jennings is not entitled relief on this ground. *Anderson v. Sec'y, Dep't. of Corr.*, 462 F.3d 1319, 1330 (11th Cir. 2006). The Eleventh Circuit has "held the state court's

failure to hold an evidentiary hearing on a petitioner's 3.850 motion is not a basis for federal habeas relief." *Id.*

The Court now turns to each of the substantive merits of the three claims the Florida Supreme Court determined were properly summarily denied:

    1.  <u>Prosecutorial misconduct</u>

This sub-claim has two parts: prosecutorial misconduct and ineffective assistance of counsel. Jennings identifies three allegedly improper statements made by the prosecutor in the sentencing phase:

> The prosecutor mischaracterized the nature of mitigation, as an "attempt to escape accountability," argued impermissible aggravating circumstances including that Jennings had "spent his ill gotten gains at Flints, a topless dance club," and stated that the co-defendant Graves had already received a life sentence.

(Doc. 61 at 96-97). And he claims the prosecutor violated his rights to due process and a fair trial by arguing inconsistent theories in Jennings' and Graves' trials. The Florida Supreme Court held these claims were procedurally barred because Jennings could and should have raised them on direct appeal.[4] *Jennings* 123 So. 3d at 1122.

Federal courts "cannot consider a claim where 'the last state court rendering a judgment in the case clearly and expressly stated that its judgment

---

[4] The Florida Supreme Court did address, and reject, Jennings' claim of inconsistent theories on direct appeal when deciding a related issue—whether Jennings' and Graves' sentences were impermissibly disparate.

rests on a state procedural bar.'" *Spencer v. Sec'y, Dep't. of Corr.*, 609 F.3d 1170, 1178 (11th Cir. 2010) (quoting *Parker v. Sec'y, Dep't. of Corr.*, 331 F.3d 764, 771 (11th Cir. 2003)).  "Accordingly, 'a federal habeas claim may not be reviewed on the merits where a state court determined that the petitioner failed to comply with an independent and adequate state procedural rule that is regularly followed.'" *Id.* (quoting *Philmore v. McNeil*, 575 F.3d 1251, 1260 (11th Cir. 2009)).  The Supreme Court affirmed these principles in *Johnson v. Lee*, 136 S. Ct. 1802 (2016).

Jennings does not attack the adequacy of the procedural rule that barred his postconviction claims.  It would have been fruitless.  *See Spencer*, 609 F.3d at 1179.  ("There is no doubt that, under Florida law, a claim is procedurally barred from being raised on collateral review if it could have been but was not raised on direct appeal.").  Two exceptions would allow this Court to consider Jennings' claims of prosecutorial misconduct:

> This procedural bar may be overcome—and we may consider the merits of these claims—only if [the petitioner] demonstrates both cause for the failure to raise the claims on direct appeal and actual prejudice, or demonstrates that a failure to consider the claims will result in a fundamental miscarriage of justice.  To establish "cause" for procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court.  To establish "prejudice," a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different.  Finally, a "fundamental miscarriage of justice" occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent.

*Spencer,* 609 F.3d at 1179-80 (cleaned up).  Jennings does not identify cause or prejudice to excuse his failure to raise prosecutorial misconduct on direct appeal.  Indeed, the prosecutor's statements at both his and Graves' trial were known when he filed his direct appeal.  Nor does Jennings claim he is innocent.  Thus, this Court may not consider his claims of prosecutorial misconduct.

Jennings also claims that Osteen was ineffective for failing to object to the prosecutor's three allegedly improper statements during sentencing:  that mitigation was "an attempt to escape accountability," that Jennings "spent his ill gotten gains at Flints, a topless dance club," and that Graves had received a life sentence.  (Doc. 61 at 96-97).  The state court properly rejected this ineffective-assistance claim because Jennings failed to show prejudice.  In fact, the trial court considered Graves' life sentence as a mitigating factor.

This claim is insufficient.   Jennings does not identify any clearly established federal law contrary to the Florida Supreme Court's reasoning or any unreasonable factual finding.  And—like in state court—he does not show any prejudice stemming from Osteen's failure to object to the prosecutor's statements.

### 2.   Failure to challenge forensic evidence

Jennings next contends counsel was ineffective because he failed to challenge the reliability of the forensic evidence.  (Doc. 61 at 102-104).  At issue

is the state's expert witness testimony of cause and manner of death and shoeprint examination, and crime-scene testimony from two police officers. Dr. Manfred Borges opined that the victims' wounds matched Jennings' Buck knife, which he saw at the scene. Borges came to his opinion by comparing the wounds to "a dental knife with almost all the same characteristics." (TT at 393). David Grimes testified that Jennings' Reebok shoes matched various shoeprints at the crime scene. And Officers Robert Browning and John Horth testified about their observations of the crime scene. Jennings claims Osteen was ineffective because he did not call his own forensic experts to rebut the state's evidence.

The Florida Supreme Court rejected this claim as legally insufficient because Jennings did "not allege what specific information other experts would have been able to offer or how this presentation would have impacted the case." *Jennings*, 123 So.3d at 1123. Jennings identifies no federal law contrary to the state court's adjudication. When "a petitioner raises an ineffective assistance claim based on counsel's failure to call a witness, the petitioner carries a heavy burden 'because often allegations of what a witness would have testified to are largely speculative.'" *Finch v. Sec'y, Dep't of Corr.*, 643 F. App'x 848, 852 (11th Cir. 2016) (quoting *Sullivan v. DeLoach*, 459 F.3d 1097, 1108-09 (11th Cir. 2006)).

In *Finch*, the petitioner asserted that a particular expert would have testified that the state's DNA evidence was unreliable because of flawed methodology, but he did not support the assertion with any evidence. *Id.* The Eleventh Circuit found that the Florida Supreme Court's denial of the claim "was not contrary to, or an unreasonable application of, clearly established federal law." *Id.* Similarly, the petitioner in *Wilson v. Sec'y, Dep't of Corr.* argued that trial counsel should have called an expert to rebut the state's medical examiner but did not establish what conclusion his expert would have reached. 769 F. App'x 825, 827 (11th Cir. 2019). The Eleventh Circuit denied the claim because "ineffective assistance of counsel cannot be proven via conclusory assertion." *Id.* Jennings has done even less than *Finch*. He does not state, even hypothetically, what forensic evidence Osteen could have presented. Jennings has not carried his burden on this point.

### 3. Failure to challenge admissibility and reliability of Jennings' confession

Jennings next faults Osteen for not investigating the circumstances surrounding Jennings' confession, which led to Osteen's alleged ineffectiveness in his motion to suppress the confession and his subsequent cross-examination of the State's key witnesses. (Doc. 61 at 104-107). Ralph Cunningham, chief investigator for the Twentieth Judicial Circuit of Florida State Attorney's Office, interviewed Jennings twice. Jennings expressly waived his *Miranda*

rights both times.  The first interview was taped, and the jury listened to the tape at trial.  Cunningham conducted a second, untaped interview the next day to "clear up some inconsistencies" and "go over some other facts."  (TT at 704). Cunningham testified that during the second interview, Jennings said, "I think I could have been the killer.  In my mind I think I could have killed them, but in my heart I don't think I could have."  (TT at 738).

Jennings argues that Osteen failed to adequately investigate two aspects of the statement:  (1) Jennings' mental health and how it affected his ability to knowingly, intelligently, and voluntarily waive his *Miranda* rights; and (2) discrepancies within and between "Cunningham's report and testimony [and] the reports of Officers Crenshaw and Rose."  (Doc. 61 at 107).

As pointed out by the Florida Supreme Court, contrary to Jennings' assertions, the state court did not summarily deny the mental-health aspect of this claim.  *Jennings*, 123 So. 3d at 1123.  Rather, the postconviction court afforded Jennings an evidentiary hearing on this claim, but the only evidence Jennings elicited was that "Osteen did not recall if defendant used drugs at the time he gave his confessions and he was sure he investigated that issue."  (PCA at 3259).  The Florida Supreme Court also denied Jennings relief on the second part of this claim—the alleged discrepancies—because Jennings did "not allege what these inconsistencies are or what information trial counsel should have been aware of or used as impeachment evidence."  *Jennings*, 123 So. 3d at 1123.

Jennings challenges no aspect of the Florida Supreme Court's adjudication of this claim, and the Court finds no fault in it. Jennings' conclusory assertion that he was unable to knowingly and voluntarily waive his *Miranda* rights is not enough. He presented no evidence to support it, despite ample opportunity—he had three mental health experts testify at the postconviction hearing, and the postconviction court gave the green light for evidence on the issue. Jennings' failure to identify the discrepancies Osteen could have used to challenge Cunningham's testimony is likewise fatal to this claim. *See Boyd v. Comm'r, Ala. Dep't. of Corr.*, 697 F.3d 1320, (11th Cir. 2012) (denying an ineffective-assistance claim because the petitioner disclosed no specific piece of evidence trial counsel should have uncovered).

Having reviewed each of the subparts of Ground Three, the Court finds Jennings has not demonstrated that the state court's rejection was contrary to clearly established federal law or based on an unreasonable determination of the facts. Ground Three is denied in its entirety. 28 U.S.C. § 2254(d).

### D. Ground 4: Jennings' statements to police, and all evidence derived from them, should have been suppressed because they were obtained in violation of his right to counsel

Jennings argues the trial court erred by refusing to suppress his statements to detectives. (Doc. 61 at 107-111). Respondents acknowledge this ground is exhausted for federal habeas purposes. (Doc. 66 at 87).

Jennings and Graves were arrested in Las Vegas on December 8, 1995. Collier County Sheriff's Office detectives Rose and Crenshaw traveled to Las Vegas later that day and met with Jennings at the Clark County Jail on December 9, just after midnight.   Detective Crenshaw read Jennings his *Miranda* warning, including his right to an attorney, whether or not he could afford one.   During the interview, Jennings said he wanted a lawyer.   The officers stopped the interview, and Detective Rose offered to get Jennings a phone book.

Investigator Cunningham went to the Clark County Jail on December 10, 1995, to talk to Graves.   As Cunningham was leaving the interview room, he saw Jennings near the booking desk.   Jennings asked Cunningham if he had heard from Tawny Jennings.   Cunningham said he had not, but that Detective Crenshaw was trying to reach her.   Jennings then said that after talking to his mother, he decided he wanted to talk about the robbery.   "He said that he did not want to take the blame for the killings of three people that his partner had done, that he wanted to tell his side of the story."   (DA at 976).

Cunningham, Rose, and Jennings went into the interview room, and Cunningham read Jennings his *Miranda* rights.   Jennings said he understood his rights and wished to speak.   He then went through the facts of the crime with Cunningham and Rose.   Cunningham asked if they could take a recorded statement, Jennings consented, and Cunningham advised Jennings of his

*Miranda* rights again.  In the two-and-a-half hour taped interview, Jennings described his history, the events leading up to the crime, and the crime itself. During the interview, Jennings told the officers where they could find some physical evidence he and Graves hid after fleeing the Cracker Barrel.  Police later recovered that evidence.  Cunningham returned to the jail on December 11 to go over some inconsistencies and other facts with Jennings.  During this conversation, Jennings said, "I think I could have been the killer.  In my mind I think I could have killed them, but in my heart I don't think I could have." (TT at 738).

Osteen moved to suppress Jennings' statements, and the trial court held a suppression hearing.  (DA at 154).  The trial court denied the motion, finding that Jennings voluntarily initiated his contact with Cunningham and Rose and knowingly, intelligently, and voluntarily waived his right to counsel and his right to remain silent.  At trial, the state played the recorded interview, and Cunningham testified about Jennings' confession over Osteen's objections. The state also introduced the physical evidence Jennings helped police recover.

On direct appeal, Jennings argued that Detective Rose's offer to get him a phone book was an inadequate response to Jennings' invocation of his right to counsel, and any subsequent waiver of his *Miranda* rights was tainted.  The Florida Supreme Court found that "even if Jennings invoked his right to counsel, he voluntarily initiated further contact with the police" and that he

gave the statements "after voluntarily, knowingly, and intelligently waiving his *Miranda* rights." *Jennings v. State*, 718 So. 2d 144, 150 (Fla. 1998). Thus, the statements were admissible under *Edwards v. Arizona*, 451 U.S. 477 (1981). The state court also found that Jennings' decision to reinitiate a conversation with Cunningham and Rose "was motivated *not* by any misapprehension of this right or 'taint' of the telephone book scenario, but by an interceding conversation between Jennings and his mother, wherein she advised Jennings to talk to the police." *Jennings*, 718 So. 2d at 149.

In his petition to this Court, Jennings' reasserts his contention that any waiver of his *Miranda* rights was not knowing, intelligent, and voluntary because of Detective Rose's allegedly inadequate response when Jennings invoked his right to counsel. Jennings' argument is based mainly on state law—the Florida Constitution provides greater protections than the federal Constitution. But Florida state law cannot be the basis of federal habeas relief. 28 U.S.C. § 2254(a); *Wilson v. Corcoran*, 562 U.S. 1, 16 (2010). And the federal cases cited by Jennings' strongly support the state court's adjudication.

In *Edwards*, the Supreme Court held that an accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police*." *Edwards*, 451 U.S. at 485 (emphasis added).

39

Jennings does not challenge the state court's factual finding that he voluntarily initiated contact with Cunningham and Rose after invoking his right to counsel.

In *Oregon v. Bradshaw*, 462 U.S. 1039 (1983), the Supreme Court reaffirmed the *Edwards* rule and clarified that even when an accused reinitiates dialogue with police, the prosecution still must prove the accused knowingly and voluntarily waived the right to counsel and the right to remain silent.  The Florida Supreme Court found that the prosecution met its burden, based on these facts:

> Upon Jennings' reinitiation of conversation with police, he was again advised of his *Miranda* rights, including his right to have a lawyer appointed to represent him before questioning if he could not afford one.  Thereafter, at the beginning of the taped interview when Detective Rose and Investigator Cunningham prepared to again advise Jennings of his *Miranda* rights, Jennings stated that he could save them the trouble because he understood his rights fully.  Despite this, Detective Rose again advised Jennings of his *Miranda* rights, once again including his right to have a lawyer appointed to represent him before questioning if he could not afford one. The record also indicates that, before making his subsequent untaped statement the next day, Jennings was again advised of his *Miranda* rights and executed a written waiver.

*Jennings*, 718 So. 2d at 150.   Jennings challenges none of these factual findings, and they are supported by the record.  The state court correctly applied *Edwards*.  Jennings fails to meet his burden for habeas relief on Ground Four, and the Court denies it.  28 U.S.C. § 2254(d).

### E. Ground 5:  Jennings' death sentence violates the Sixth and Eighth Amendments and his right to due process because a jury did not make all necessary findings of fact

Jennings attacks the constitutionality of his sentence and the procedure used to deny his successive Rule 3.851 motion in light of the Supreme Court's decision in *Hurst v. Florida*, 136 S. Ct. 616 (2016) and its progeny.  (Doc. 61 at 112-139).  Before addressing the claims, the Court provides some background.

After the jury found Jennings guilty on all counts, the trial court conducted the sentencing phase of trial.   Upon conclusion, the jury recommended a death sentence by a vote of 10 to 2.  The trial court found three statutory aggravating factors—commission during a robbery, avoiding arrest, and CCP—outweighed the mitigating circumstances and, following the jury's recommendation, sentenced Jennings to death.   Jennings' convictions and sentence became final in 1999, when the Supreme Court denied Jennings' petition for a writ of certiorari.

In 2002, the Supreme Court cast doubt on the constitutionality of Florida's capital sentencing scheme when it held Arizona's procedure, which was similar in some respects to Florida's, violated the Sixth Amendment. *Ring v. Arizona*, 536 U.S. 584 (2002).  The Arizona scheme required the trial judge, following a jury adjudication of a defendant's guilt for first-degree murder, to determine the presence or absence of aggravating and mitigating factors.  The Arizona judge could sentence the defendant to death only if there was at least

one aggravating factor and "no mitigating circumstances sufficiently substantial to call for leniency." *Id.* at 593. The Court reasoned that "Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,'" so "the Sixth Amendment requires that they be found by a jury." *Id.* at 609 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000)).

In 2016, the Supreme Court held Florida's capital sentencing scheme also violated the Sixth Amendment. *Hurst*, 136 S. Ct. 616. Despite the differences in Florida's and Arizona's schemes—namely, Florida's requirement for a jury recommendation—the Court found *Ring* applicable. Since Florida's death-penalty statute required the judge—not the jury—to decide whether any aggravating factors existed, it violated the Sixth Amendment. *Hurst*, 136 S. Ct. at 624. The Court overruled previous decisions *Spaziano v. Florida*, 468 U.S. 447 (1984) and *Hildwin v. Florida*, 490 U.S. 638 (1989) "to the extent they allow a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for imposition of the death penalty." *Id.* at 624.

On remand of *Hurst v. Florida,* the Florida Supreme Court went a step further. Along with the existence of aggravating circumstances, it held that a "jury must also unanimously find that the aggravating factors are *sufficient* for the imposition of death and unanimously find that the aggravating factors

*outweigh* the mitigation before a sentence of death may be considered by the judge." *Hurst v. State*, 202 So. 3d 40, 54 (Fla. 2016).  The court based its heightened protection in part on Florida law and in part on its understanding that "*Hurst v. Florida* mandates that all the findings necessary for imposition of a death sentence are 'elements' that must be found by a jury[.]" *Id.* at 57.

In 2016, the Florida Supreme Court addressed the retroactivity of *Hurst* in two separate cases: *Asay v. State*, 210 So. 3d 1 and *Mosley v. State*, 209 So. 3d 1248.  Applying *Witt v. State*, 387 So. 2d 922 (Fla. 1980), which provides more expansive retroactivity standards than the federal *Teague* test, the court decided to make the Supreme Court's issuance of *Ring* the cutoff date.  Thus, Florida courts retroactively apply *Hurst* only to cases in which a death sentence became final after June 24, 2002.  *Asay*, 210 So. 3d at 22; *Mosley*, 209 So. 3d at 1283.

Despite Jennings' 1999 finality of sentence and conviction, he filed a successive Rule 3.851 motion, seeking relief under *Hurst*.  After the post-conviction court denied Jennings' motion, he appealed to the Florida Supreme Court.  The Florida Supreme Court  stayed Jennings' appeal pending its decision in *Hitchcock v. State*, 226 So. 3d 216 (Fla. 2017).  In *Hitchcock*, the Florida Supreme Court rejected constitutional arguments that *Hurst* should be applied to sentences that became final before *Ring*.  The court then ordered Jennings to show cause why its reasoning in *Hitchcock* should not be

dispositive in his case. Jennings' response failed to sway the court, and it affirmed denial of his motion. *Jennings v. State*, 237 So. 3d 909 (Fla. 2018).

The Court turns to the claims raised in in Ground Five.

1. <u>Jennings' right to retroactive application of *Hurst v. Florida*</u>

Jennings argues the Florida Supreme Court's decision to deny him relief under *Hurst* is contrary to federal law for three reasons: (1) *Hurst* announced substantive constitutional rules that must be given retroactive effect; (2) Florida's limited retroactivity rule violates the Eighth Amendment because it ensures arbitrary and unreliable infliction of the death penalty; and (3) Florida's limited retroactivity rule violates the Equal Protection Clause of the Fourteenth Amendment.

i.   *Retroactive effect of* Hurst

When facing questions of retroactivity in habeas cases, federal courts must apply the standards articulated in *Teague*. The first step is to determine when the petitioner's conviction became final. *Knight*, 936 F.3d at 1334. Jennings' conviction became final when the Supreme Court denied his motion for a writ of certiorari on June 24, 1999. Next, if the rule at issue had not been announced by the final-conviction date, the Court must "'assay the legal landscape' as it existed at the time and determine whether existing precedent compelled the rule—that is, whether the case announced a new rule or applied an old one." *Id.* Jennings does not argue that *Hurst v. Florida* applied an

existing rule. Even if he did, the Eleventh Circuit has rejected that argument because "*Hurst* was not dictated by prior precedent—and in fact explicitly overruled existing precedent upholding Florida's death penalty sentencing scheme[.]" *Id.* at 1336.

Jennings focuses on the final step of the *Teague* analysis—whether *Hurst* falls within one of the two exceptions to nonretroactivity. Those exceptions are "(1) holdings that create substantive (not procedural) rules that place 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe,' and (2) holdings that constitute 'watershed rules of criminal procedure.'" *Id.*

Jennings hangs his hat on the first exception, arguing that *Hurst* announced two substantive rules:

> First, the court held that the Sixth Amendment requires that a jury decide whether the aggravating factors have been proven beyond a reasonable doubt, whether they are sufficient to impose the death penalty, and whether they are outweighed by the mitigating factors…Second, the court held that the Eighth Amendment requires the jury's fact-finding during the penalty phase to be unanimous.

(Doc. 61 at 126-27). Jennings' argument fails. First, he relies on Florida Supreme Court's *Hurst v. State* decision, not the United States Supreme Court's *Hurst v. Florida* decision. Federal habeas relief must be based on federal law, as established by the United States Supreme Court. *Hurst v. Florida* announced a narrower rule than *Hurst v. State*—the Sixth Amendment

requires a jury, not a judge, to determine the existence of any aggravating factors.  The Florida Supreme Court's broader interpretation of *Hurst v. Florida* was wrong, a mistake it recently recognized in *State v. Poole*, 297 So. 3d 487 (Fla. 2020):  "This Court clearly erred in *Hurst v. State* by requiring that the jury make any finding beyond the section 921.141(3)(a) eligibility finding of one or more statutory aggravating circumstances."  *Poole*, 297 So. 3d at 503.

The issue for this Court is whether either of the *Teague* exceptions applies to the narrower rule announced in *Hurst v. Florida*.  The Eleventh Circuit decided they do not in *Knight*:

> The *Hurst* rule does not fit within either exception.  To begin, substantive rules include decisions that change the range of conduct or the class of person that the law punishes.  Procedural rules, on the other hand, regulate only the *manner of determining* the defendant's culpability.  In considering which category the *Hurst* rule falls into, we have a head start because the Supreme Court has already held that *Ring* represented a prototypical procedural rule.  And that makes sense:  *Ring* changed the permissible *procedure* for sentencing in a capital case when it required that a jury rather than a judge find the essential facts necessary to impose the death penalty.  Because *Hurst*'s holding— that an advisory jury's mere recommendation is not enough to satisfy this procedural requirement—is an extension of the rule from *Ring*, we have no trouble concluding that *Hurst* also announced a procedural rule, and not a substantive rule.

*Knight v. Fla. Dep't of Corr.*, 936 F.3d 1322, 1336-37 (11th Cir. 2019).

Jennings, like Knight, does not contend that *Hurst v. Florida* fits within the second exception.  "Indeed, the watershed exception remains somewhat

theoretical at this point; in the years following *Teague*, the Supreme Court has never found a rule that fits." *Id.* at 1337. "In short, *Hurst* [*v. Florida*] meets neither exception, and therefore is not retroactive." *Id.*

      ii.    *Retroactivity and the Eighth Amendment*

Before addressing Jennings' two constitutional objections to Florida's retroactivity decision *vis-à-vis Hurst v. Florida*, the Court notes that they are probably not cognizable here. States may fashion and apply their own retroactivity standards in state postconviction proceedings, and state retroactivity decisions have no significance in federal habeas cases. *Id.* Before applying any rule retroactively, this Court *must* perform a threshold *Teague* analysis. *Id.* Thus, this Court cannot grant Jennings any relief under *Hurst v. Florida* without ignoring the binding precedent set out in *Knight*.

Jennings raises three Eighth Amendment arguments. His first is an attack on a fundamental aspect of retroactivity. Jennings contends that by setting a cutoff date for the retroactivity of *Hurst v. Florida* and *Hurst v. State*—permitting *Hurst* relief only to inmates whose death sentences were final before June 24, 2002—the Florida Supreme Court ensured arbitrary infliction of the death penalty. Jennings provides no Supreme Court precedent suggesting that state retroactivity decisions cannot hinge on the date a conviction becomes final. Indeed, the *Teague* test does just that: "Unless they fall within an exception to the general rule, new constitutional rules of criminal

procedure will not be applicable to those cases which have become final before the new rules are announced." *Teague*, 489 U.S. at 310.

Jennings next argument has nothing to do with the retroactivity of *Hurst v. Florida*. Rather, it springs from a rule adopted by the Florida Supreme Court in *Hurst v. State*: "the penalty phase jury must be unanimous in making the critical findings and recommendation that are necessary before a sentence of death may be considered by the judge or imposed." *Hurst*, 202 So. 3d at 59. The Florida Supreme Court recognized it was adopting a rule that required "more protection…than that mandated by the federal Constitution[,]" and it explicitly derived the rule from "the Florida Constitution and Florida's long history of requiring jury unanimity in finding all the elements of the offense to be proven[.]" *Id.* at 54-57. Based on state law supplemented by snippets of Supreme Court *dicta*, Jennings argues his death sentence violates the Eighth Amendment because it flowed from a non-unanimous death recommendation. The argument fails because Jennings identifies no misapplication of federal law. What is more, the jury did unanimously find one aggravating factor when it convicted Jennings of robbery. *See* Fla. Stat. § 921.141(6)(d).

Jennings' third Eighth Amendment argument has even less to do with *Hurst v. Florida*. He raises a *Caldwell*[5] challenge based on the trial court's

---

[5] *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985).

instruction to the jury "that its penalty phase verdict was merely advisory and only needed to be returned by a majority vote." (Doc. 61 at 134). The Supreme Court explained the reach of *Caldwell* in *Romano v. Oklahoma*:

> [W]e have since read *Caldwell* as relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision. Thus, to establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.

512 U.S. 1, 9 (1994) (cleaned up). Jennings identifies no part of the trial court's instructions to the jury that mischaracterized the jury's role in sentencing, and after thorough review, the Court finds none. Jennings' *Caldwell* challenge lacks merit. *See Davis v. Singletary*, 119 F.3d 1471, 1482 (11th Cir. 1997) ("[I]t is clear that references to and descriptions of the jury's sentencing verdict as an advisory one, as a recommendation to the judge, and of the judge as the final sentencing authority are not error under *Caldwell*…because they accurately characterize the jury's and judge's sentencing roles under Florida law.").

### iii.    *Retroactivity and the Fourteenth Amendment*

Finally, Jennings argues that Florida's retroactivity rule violates the Equal Protection Clause: "Florida's decision to apply the *Hurst* decisions only to the 'post-*Ring*' group of death row inmates results in the unequal treatment of prisoners who were all sentenced to death under the same unconstitutional

scheme." (Doc. 61 at 136). This argument is merely a restatement of his Eighth Amendment argument, and it fails for the same reasons. The Supreme Court not only approves of but mandates a retroactivity rule that hinges on when sentences became final. *Teague, supra.*

To establish an equal-protection violation, Jennings "must prove purposeful, intentional discrimination—and to do that, he must prove that the governmental decisionmaker acted as it did 'because of, and not merely in spite of, its effects on an identifiable group.'" *Morrissey v. United States*, 871 F.3d 1260, 1171 (11th Cir. 2017) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). Jennings fails to allege—much less prove—an unlawful intent. The Florida Supreme Court explained the reason for the rule in *Mosley v. State*, 209 So. 3d 1248, 1281 (Fla. 2016); it believed "that Florida's capital sentencing statute was unconstitutional from the time that the United States Supreme Court decided *Ring*."

Thus, Jennings has not demonstrated his sentence violates the Equal Protection Clause of the Fourteenth Amendment.

2. Florida Supreme Court's procedure on appeal of Jennings successive Rule 3.851 motion

Jennings contends that by ordering him to brief the applicability of *Hitchcock* to his case, and by affirming the denial of his successive Rule 3.851 motion without full briefing, the Florida Supreme Court violated his Eighth

Amendment and Fourteenth Amendment rights to due process.   Jennings'
argument fails for two reasons.   First, the Florida Supreme Court's procedure
did not harm Jennings because he is not entitled to retroactive application of
*Hurst v. Florida*.   Second, an alleged defect in a state collateral proceeding
cannot be the basis for federal habeas relief because it does not undermine the
legality of the conviction itself.   *Holsey v. Thompson*, 462 F. App'x 915, 917
(11th Cir. 2012).

Having reviewed each of the subparts of Ground Five, the Court finds
Jennings has not demonstrated that the state court's rejection was contrary to
clearly established federal law or based upon an unreasonable determination
of the facts.   Ground Five is denied in its entirety.   28 U.S.C. § 2254(d).

## DENIAL OF CERTIFICATE OF APPEALABILITY

A prisoner seeking a writ of habeas corpus has no absolute entitlement
to appeal a district court's denial of his petition.   28 U.S.C. § 2253(c)(1).   Rather,
a district court must first issue a certificate of appealability (COA).   "A [COA]
may issue…only if the applicant has made a substantial showing of the denial
of a constitutional right."   28 U.S.C. § 2253(c)(2).   To make such a showing, a
petitioner must demonstrate that "reasonable jurists would find the district
court's assessment of the constitutional claims debatable or wrong," *Tennard
v. Dretke*, 542 U.S. 274, 282 (2004) (*quoting Slack v. McDaniel*, 529 U.S. 473,
484 (2000)), or that "the issues presented were adequate to deserve

encouragement to proceed further," *Miller–El v. Cockrell*, 537 U.S. 322, 335–36 (2003) (citations omitted).  Jennings has not made the requisite showing here and may not have a certificate of appealability on any ground of his Petition.

Accordingly, it is now

**ORDERED:**

(1) Petitioner Brandy Bain Jennings' Amended Petition for Writ of Habeas Corpus by a Person in State Custody (Doc. 61) is **DENIED**.

(2) Petitioner is **DENIED a certificate of appealability**.

(3) The Clerk of the Court is **ORDERED** to terminate any pending motions, enter judgment, and close this case.

**DONE** and **ORDERED** in Fort Myers, Florida on December 1, 2020.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record